GEORGIA,
Chatham Co.
JUNE, 1809.

The Bank
vs.
Marchand.

*Minutes of Superior Court, letter G. p.* 201.

*June,* 1809.

## The BANK *vs.* MARCHAND.

### NEW TRIAL.

By *Charlton,* Judge.

THIS is a motion for a new trial upon these grounds, viz.

1. Because the verdict is against evidence.

2. Because the verdict is against the law, equity, and the direction of the court.

On all motions for new trials, the law requires that the reasons of the judge for refusing or granting the rule, should be placed upon the minutes of the court ; in conformity to this requisition of the judicial act, I shall assign my reasons for granting a new trial in this case ; and in discharging this duty, it is only necessary to advert to the second ground, to wit, " because the verdict is against law, equity, and the direction of the court." The power of granting a new trial is discretionary with the court, but this, as C. J. Glynn says, must be a judicial, not an arbitrary discretion. Under our system the verdict of a special jury is conclusive in all its issues of law and equity. The verdict of a special jury is, therefore, the *dernier resort* of a citizen, and his only relief against the injustice of that verdict must be found in a reference to the judicial discretion of the court, on a rule to show cause why a new trial should or should not be granted. The circumstances of this case, as far as they are material to the present investigation, are these :

A copartnership had been entered into between *F. de Petit de Villiers,* and *Mathurin Reingard.* The copartnership was dissolved on the 12th August 1805.

GEORGIA,
Chatham Co.
JUNE, 1809.

The Bank
vs.
Marchand.

Antecedent to the dissolution of this copartnership, a debt had been contracted at bank by *Petit* and *Reingeard*. On the 26th May, 1807, this old debt of *Petit* and *Reingeard* was, according to the usage of the bank *renewed*, as the witness, Mr. *Lampkin*, expressed it. by a note signed by *Petit* and *Reingeard*, in their individual capacity. On the 28th May, 1807, Mr. *Reingeard* conveys by a deed bearing that date, for the uses of Messrs. *I. M. E. F. Coquillon*, three negro slaves, all the merchandise which he then possessed, together with an interest in a house and the lease of it. The consideration of this deed is expressed to be the good and friendship which he the said Mr. *Reingeard* bore to Miss *Coquillon*. On the 21st May, 1807, in consideration of a marriage to be solemnized between *Reingeard* and Miss *Coquillon*, *Reingeard* settles upon Miss *Coquillon* and her future issue (and the children of *Reingeard* by a former wife,) through the medium of trustees, the identical property, which he had in consideration of good will and friendship conveyed to her by the deed dated the day before. The deed of the 20th was no doubt intended to operate as articles ; but there is no provision for the issue ; it conveys an absolute unconditional estate to Miss *Coquillon*. The deed of the 21st (with the exceptions of limitations to *Reingeard's* children by a former marriage,) is a strict settlement ; it gives an estate for life to the intended wife, with a remainder over to the unborn issue.

The important questions for my consideration, as the result from this statement, are these. Was *Mathurin Reingeard* indebted to the bank, antecedent to the settlement of the 21st May ? and if so indebted, can that debt defeat the marriage settlement ? I was of opinion on the trial, and now mature deliberation has not changed my opinion, that *Mathurin Reingeard* was not indebted to the bank, in his individual private capacity at the time of the marriage settlement on the 21st of May. The note, of which the note of the 26th of May is said to be a renewal, was given by *Petit* and *Reingeard* in their artificial capacity as partners ; the note of the 26th of May was given in their individual capacities nearly two

years after the dissolution of their copartnership, here then a liability was created different from that which was created by the note of the partnership. Partners are seized "*per my et per tout, qui libet totum tenet, et nihil tenet, silicit totum in communi, et nihil seperatum per se.*" Judgment obtained therefore upon the partnership note, would have bound the whole of the partnership effects, and only the separate estates are bound by the judgment on the note given in their private unconnected capacities. The principles of law having created so wide a distinction between the liability of partners and individuals, I cannot identify the notes of *Petit* and *Reingeard* with the note of *F. D. Petit de Villiers* and *Mathurin Reingeard*. I know not what may be the construction given by the bank to a *renewed* note; but it appears to me from the *evidence* that they considered the renewed note as complete extinguishment of the old debt; for the old note is upon its renewal delivered to the maker. Can that then be considered as an existing debt, which the bank, by its own voluntary act, enables the debtor to cancel or destroy? Arguing the case therefore upon the usage of the bank, the renewed note may be considered as a continuation of the old debt, but it cannot retrospect for any purpose whatsoever. I am of opinion, then, that there was no debt due the bank by *Mathurin Reingeard* in his individual capacity antecedent to the 26th of May, and that the note of *Petit* and *Reingeard* was extinguished from the moment of the voluntary re-delivery of it to one of the makers, and it appears, from evidence on the trial, that it was re-delivered to *Petit*. If a debt however had existed, it could not have defeated the operation of the settlement of the 21st of May, so far as that deed provided for the wife and her future issue; she would, notwithstanding, be entitled to a life estate, and the children be entitled to their portions in the manner prescribed by the deed; but if the settler was indebted, the children by the first marriage would come in as volunteers, and their interest would give way to the rights of the general creditors. The evidence upon the trial established no

GEORGIA,
Chatham Co.
JUNE, 1809.

The Bank
vs.
Marchand.

32

GEORGIA,
Chatham Co.
JUNE, 1809.

The Bank
vs.
Marchand.

strong proofs of fraud ; but if fraud had been established, I doubt very much whether the principle, that fraud vitiates every contract, can apply to the doctrine of marriage settlement. Marriage is a valuable consideration, as much so, as money paid ; and it is not only founded upon a valuable consideration, but it guarantees a protection to their persons, who cannot by any possibility be conusant of the fraud of the settler, and who, in the view of morality and justice, have stronger claims upon the property than the general creditors. No cases were cited from the common law reporters, which tended to shake the consideration of a marriage settlement. We all know how solicitous courts of chancery have always been, in supporting this species of contract against the rights of all others. It is true, that in Bennet *vs.* Wade, and Jones *vs.* Wade, 1 Dick. p. 84, and 2 Atk. 324, that the settlement was set aside upon the ground of fraud ; but as the case is reported by the Register, Dickens, it appears, the settlement was made *subsequent* to the marriage, and it will not be contended by me, that a settlement or provision for the wife and children, subsequent to marriage, stands upon a better footing than a voluntary conveyance. The point, however, whether a settlement in consideration of marriage, procured by fraud and imposition, in which the wife was not concerned, could be set aside, came before lord Bathurst, in the case of Barrow *vs.* Brown, 13 July, 1774, upwards of thirty years posterior to the decision of lord Hardwicke, in Jones *vs.* Wade, and in this case the chancellor is made to say, " that whatever fraud or imposition might have been practised by others, *Charity*, the wife, was not concerned in it ; I never knew an instance in which a settlement in consideration of marriage hath been set aside, and I will not make a precedent for it." 1 Dick. 504. It is needless, I presume, to multiply cases on this head. Upon the supposition that the fraud of *Reingeard* could subvert the marriage settlement, yet how is it established ? it was not proved that he was in debt beyond the value of the property, admitting the existence of the debt of the bank. But it is

said by Mr. *Harris*, that *Reingeard* was permitted to remain in the possession of the property settled upon his wife, and this is one of the strongest evidences of fraud. I admit generally that this is an absolute badge of fraud, because, as the books lay it down, the possession is often the only indication of the property of a chattle. 3 Cro. 81. But in answer to this, it was observed by Mr. *Cuyler*, (and to which I assent,) that the possession of the property by the settler, is not inconsistent with the nature of the contract ; and because such possession holds out no false colours, the law rendering it necessary to have the deed recorded, which is sufficient notice to the public of his situation and circumstances. Mr. *Harris* contends that the conveyance, as in the case of all the property, is another strong mark of fraud. I admit that the general conveyance of *all* a man's property, as in this case, is another strong mark of fraud ; for, as the authorities I have adverted to assert, it is hardly to be presumed that a man will entirely strip himself of all his personal property, unless there was a secret correspondence and good understanding settled between him and the vendee for a private occupancy of all, or some part, of the goods for his support. In the construction of the statutes of 13 and 27 Elizabeth, such a conveyance, as it effects the immediate vendor and vendee, would be deemed fraudulent, because it presupposes the absence of a valuable consideration, without notice or collusion ; and a marriage being a valuable consideration, and the children being purchasers without collusion or notice, the conveyance of *all* the property in a marriage settlement cannot be considered as a mark of fraud, within the British statutes of Elizabeth. It is further argued by Mr. *Harris*, that, merchandise, jewelry, or stock in trade, cannot legally be conveyed in a marriage settlement ; because a settlement is intended to operate as a permanent provision to the issue, the object of which is frustrated by the unfixed and transitory nature of such chattles ; and besides, if such settlement was recognised, it would enable unprincipled merchants to speculate with perfect security upon the rights and credulity

of their creditors.   In answer to these objections I shall only briefly observe, that as to all legal consequences there is no distinction in this state between one species of chattle and another, or between real and personal property, and if slaves can be the subject of a marriage settlement, so may bales of merchandise ; this perishable and transitory property can, on the application of the trustees to the equitable side of this court, be converted into money, and that money invested in other property ; and in this way a permanent provision obtained.   The other argument "*ab inconvenienti*" is repelled by the necessity the law imposes, of having the deed placed upon the public record ; and this settlement was recorded on the 25th of May, 1807.

For these reasons I am of opinion, that the rule to show cause, why a new trial should not be granted, be made absolute.

*Rule made absolute.*

*Mitchell, Bulloch,* and *Cuyler* for the rule.
*Davis, Berrien,* and *Harris,* against it.